Good morning. The first case for today is United States v. Denezpi, 19-1213. Counsel, a plan on having three minutes of uninterrupted time to begin. You need not take all that time. If you want to release the time and invite questions, you're free to do so. But it may move more smoothly if we allow you to begin and have that time. So, counsel for the appellant, you may begin when you're ready. Thank you, your honor. May it please the court, good morning. My name is Teresa Duncan and I represent the appellant Merle Denezpi. The fundamental question before this court is whether the origin of a court of Indian offenses, otherwise known as a CFR court, the power to prosecute criminal offenses is the tribe's inherent authority, the federal government, or both. For the reasons I will get to in a moment, the answer is both. And because the source of prosecutorial powers in a CFR court shares a common origin with the federal district court, Merle Denezpi's prosecution in both courts for the same conduct violated the Fifth Amendment prohibition against double jeopardy. Now, it's undisputed that the Ute Mountain Ute tribe is a sovereign and it retains its inherent power to enact criminal laws and to enforce those laws against tribal members on its sovereign land. But this case does not involve a tribal court created and administered by the tribe. It involves a CFR court created by the federal government, in particular the Department of the Interior. In this case, both the CFR court and the district court drive prosecutorial authority from the federal government and to different degrees inherent tribal sovereignty. So I'd start with the federal government is a source of a CFR court's prosecutorial authority for several reasons. First, as I said before, the CFR courts were established by the federal government, in particular the Department of the Interior. And in establishing the CFR courts, the Department of the Interior notes that the purpose of the courts is, quote, to provide adequate machinery for the administration of justice for Indian tribes in those areas of Indian country where tribes retain jurisdiction over Indians that is exclusive of state jurisdiction, but where tribal courts have not been established to exercise that jurisdiction. In other words, the CFR courts are somehow like stopgap courts where a tribe has not exercised its inherent authority to establish its own court. The regulations that establish CFR courts do not require that a tribe consent to their creation. It is solely a creation of the federal government. Although the regulations permit a tribe to approve court rules, confirm the appointment of judges, and address other court matters, the regulations requiring such approvals may be waived by the Secretary of the Interior, so that ultimately the Secretary of the Interior is responsible for the administration and functioning of the CFR court. The regulations limit the court's jurisdiction. So, for example, a tribe may not be sued in a CFR court unless it waives its tribal immunity. Additionally, the federal regulations prescribe the crimes that may be prosecuted in the CFR courts. And although they allow a tribe to enact ordinances that are enforceable, if approved by the Assistant Secretary of the Interior, the bulk of the crimes are defined in the federal regulations themselves. And in this case, Mr. Nespi was charged with three offenses, two of which were defined in the CF and the Code of Federal Regulations, and one of which had been established by the Ute Mountain Ute Tribe. Finally, the records of the CFR court belong to the federal government, not the tribe. Thus, while the CFR courts function as tribal courts, and are a vehicle through which a tribe may exercise its prosecutorial authority, the tribe's inherent power to prescribe laws and punish infractions of those laws is not the only wellspring from which the court's authority springs. An additional wellspring is the federal government. And this is in contrast to tribal courts. Tribal courts are created by the tribes, they're administered by the tribes, and they enforce solely tribal laws. Now, in my brief, and also in the government's brief, we cite the cases that recognize the hybrid nature of CFR courts. And in these cases, the issue is whether the CFR courts were properly created. In other words, did the federal government have the power to create them? The answer being yes. And then the second question being, do those courts have jurisdiction to resolve intertribal or intratribal disputes? And, again, the answer is yes, because those courts recognize that a source of power is the tribe's inherent authority to prescribe criminal laws for offenses occurring on their land and then to prosecute those offenses. Ms. Duncan, this is Judge Holmes. Let me ask you a question now. I heard your recitation as it relates to the CFR court, but I'm sitting here looking at Sanchez Valley, and I have a hard time squaring your conception of a CFR court as having exercising federal authority or exercising an issue of federal sovereignty when it seems clear that the question of whether a CFR court is controlled by the federal government, whether it's defined by the regulations of the federal government, really doesn't get to the heart of the matter, does it? The heart of the matter is whose sovereignty is being handled or administered in the context of the CFR court. Your Honor, I agree, but I think that this case is different than Sanchez Valley because the authority here, I mean, there's no question tribes have the authority to prosecute, and the federal government has the authority to prosecute. But here the federal government, it's not just that the federal government is administering the CFR court. It created it, and it created it without the consent of the tribes in and of itself to enforce laws that weren't listed in the Major Crimes Act on Indian land that lacked tribal courts. So if it was a tribal court, we wouldn't be in front of this court, but it's not. It's both a tribal court and a federal court. Well, that goes to a functionalist approach. I mean, it seems to me that's a question of who essentially sets up the structure of the CFR court. But, I mean, the language of Sanchez Valley says the degree to which an entity exercises self-governance, whether autonomously managing its own affairs or continually submitting to outside direction, plays no role in the analysis. And so the fact that the federal government created this thing from scratch, if one were to posit that, that is the CFR court, that really doesn't tell us anything, does it? I mean, I don't understand why that really matters. Because, Your Honor, it matters because, okay, and I think in other cases where the court's looking at the dual sovereignty doctrine, the courts are created and managed and controlled by separate entities. So the municipality creates its own courts. The state has its own courts. And then the court looks at the source of power for the municipality, says it came from the state. So the municipal court derives from the same source of power as a state court, and double jeopardy applies. Here, the CFR courts are derived not only from tribal sovereignty but also from the federal government's supervisory authority over Indian land. So it's similar to so Indian tribes retain that inherent jurisdiction to create crimes and prosecute crimes on their land, period. So they retain the inherent jurisdiction or the inherent authority, for example, to criminalize the crimes that are listed in the Major Crimes Act. And the federal district courts exercise their jurisdiction because of the United States supervisory authority over Indian land. So in some ways that jurisdiction is derived also from the inherent sovereignty of a tribe. Wait a minute. If you'll stop there, I noticed that in your brief, and I have a hard time understanding that. I mean, the federal district court is exercising Article III authority relative to federal statutes that were Congress promulgated under or enacted under Article I. I mean, the structure is not the same. Explain to me how a federal district court has any role in tribal sovereignty. They're enacting on the basis of congressional legislation. I agree, Your Honor. I'm not arguing that the federal district courts are exercising tribal authority, but rather that in essence the enactment of the statute stems from tribal authority, that the government has supervisory authority over the tribes, has chosen that there are certain very serious offenses that tribal court systems are not, at least at the time that the statute was enacted, capable of prosecuting that were then set aside to the federal government. Yes, but that's Congress's plenary authority over tribes. It has nothing to do with the tribes, does it? I mean, the tribes are dependent sovereigns. So it's Congress acting. It's not the tribal authority. I absolutely agree, Your Honor. But I think that the Congress is acting because of the tribes' dependent status, right? And so I think the same thing is true in the CFR courts, where they're creating courts because the tribes are dependent, and they're setting forth offenses where a tribe has not enacted the laws or created a tribal court to express its own tribal sovereignty. So I'm not arguing— Counsel, this is Judge Seymour. What is the effective difference between a tribal court set up by the tribe and the CFR courts with respect to the jurisdiction of the court? I think, Your Honor, that the tribal court jurisdiction and the CFR court jurisdiction are very similar. I would say the tribal court has jurisdiction over the tribe in a way that the CFR courts do not have, since the CFR courts won't have jurisdiction over a tribe unless the tribe waives its sovereign immunity. So I think that there's that. The tribal courts enforce tribal law, so they may adopt or incorporate the CFR offenses, but they become tribal law. So it is slightly different. And in a tribal court, the creation, the management all resides within the tribe, and none of it resides or is born from the federal government. Counsel, this is—oh, excuse me. Go ahead, Judge Seymour. No, your turn. All right. I'm just trying to make sure I understand your position. If the court finds that the ultimate source of power for the prosecution is unextinguished sovereignty of the tribe, do you just per se lose, or do you say that because the federal government has provided adequate machinery, that somehow defeats the notion that the sovereign has jurisdiction? I don't think I lose, Your Honor. I mean, I think this is a really unusual case, because in other cases before this court and the Supreme Court, the sovereign entity at issue creates, manages, controls the courts that are issued. So whether it's a municipality or an Indian tribe in tribal court versus the federal government, here it's both. I mean, this is a hybrid court where the source of power is coming from the unextinguished power of the tribal court and also from the federal court. Well, the federal part of this is simply to provide the mechanism for the prosecution, but the source of the power. Do you contend that the federal government is the source of the power as opposed to simply setting up the adequate machinery? I do in CFR courts, Your Honor, yes, because those courts are created without the consent of the tribes. In some instances, tribes may adopt CFR courts as tribal courts, but looking just at the statute and looking at the regulations, these courts are created from the federal government. This is not a creation of the tribe, of its own power. So while the CFR courts do recognize that inherent authority, that unextinguished authority, it's a court that has two sources. Couldn't the tribe obviate the existence or negate the existence of the CFR court by just setting up their own court? Yes, they could with the approval of the Secretary of the Interior. Okay. So, I mean, it's not without their consent. I mean, they've consented by acquiescence to not have their own court system. I'm not sure. I mean, over time that may be true. I mean, in the beginning it was the CFR courts were created to fill a gap, you know, between state and federal jurisdiction where there was no tribal jurisdiction. So I think it could be that a tribe acquiesces by inaction, or it could be that a tribe simply acquiesces because they don't have the capability or the desire to set up their own tribal court. And, Your Honor, if there's no further questions, I'd like to reserve some time for rebuttal. That's fine with me. Okay. Thank you, Your Honors. Mr. Graves, are you ready to proceed? I am. Thank you. Great. Please proceed. May it please the Court, Jeffrey Graves on behalf of the United States. I'd like to pick up where the appellant left off with the notion of a dual wellspring of authority. I think it's important to emphasize that what the appellant is asking for by asserting that there's such a thing is a novel judicial creation. And it's the government's position that that conflicts with the language from the Sanchez-Val case, which asks this court to look at the ultimate source of the authority to prosecute, in a sense. I agree with the appellant that it's important to look at the language of the regulation that establishes these courts, which says that it provides the adequate machinery for the administration of justice where the tribes retain jurisdiction. Critically, it does not say that it's creating any sort of jurisdiction, and most relevantly, it's not saying that it's creating federal jurisdiction. The machinery itself does not determine the ultimate source of the power, and that's emphasized both in the Sanchez-Val case as well as the Wheeler case. It's also consistent with how this court has described CFR courts in the Tillett decision, where it refers to them as the forum through which the tribes can exercise its jurisdiction. By way of analogy, I think it's helpful to consider these courts very much like a car. The ultimate responsibility for what the car does or where the car goes is the driver. The make and model of the car or the machinery, in terms of the regulation, don't change the responsibility of the person behind the wheel. And the Ute Mountain Utes have chosen this forum to adjudicate tribal disputes and to exercise their jurisdiction. The clearest example of that from the record is the very charge that constitutes the lesser-included offense in this case, the assault and battery conviction, which is a violation of Title VI, Section 2 of the Ute Mountain Ute Code. This offense was specifically passed by the Ute Mountain Ute Tribal Council, and appellant has not pointed to any authority where the federal government could prosecute a tribal offense that's promulgated by a tribal council. I don't understand. This is Jeff Tones. I don't understand that last point. I mean, if the tribal council had passed this code, why couldn't the federal government incorporate it and prosecute and allow for the prosecution of it in a CFR court? The corollary or the analog being the situation where you have the Assumptive Crimes Act, and in federal district court, you can prosecute state offenses. So, I mean, why couldn't the federal government take it in the CFR court? I mean, why couldn't the CFR court prosecute without the tribe saying, go ahead and do it? Well, pursuant to the plenary power of Congress to regulate the domestic dependent nations, you could argue that they could, in fact, do that. What it does show, however, is to appellant issue with respect to the consent of the tribal council that they have agreed or done more than simply acquiesce to these courts being the forums through which they resolve disputes. Given the status of a tribe, the United States Congress has the ability to eliminate that tribe. It has the ability to do essentially whatever it wants with respect to the tribe, but lacking some sort of affirmative action, I don't think there's authority at this point to say that the federal government can prosecute something that's passed by a tribal council. And I do think it's important... Prosecute it in federal court, you mean, as opposed to the CFR court. Yes, Your Honor. Our position is that the CFR courts are not deriving from federal authority, and so that would be the tribe that's prosecuting those within a CFR court. I also would like to turn the court's attention to... Excuse me, this is Jeff Holmes. But the CFR court, you acknowledge, is distinct from tribal courts. They don't have a tribal court, but they are distinct entities, right? Yes, Your Honor, I think that's clear. And it's also clear, as the appellant argued, that the CFR courts do have characteristics of a federal agency. But that's not the question that the Supreme Court instructs us to ask with respect to the ultimate source of the ability of crimes to be prosecuted in that forum. And that's consistent with the long understanding that the federal government is not prosecuting Indian individuals in Indian country for misdemeanor offenses. Now, I do concede that if Congress decided to act and allow the federal government to do that, it could. But appellant's reading of the nature of the CFR court would result in a sweeping expansion of federal power to interfere with the sovereignty of the tribes. And that's something that, given the plenary authority of Congress, you would expect to see some more affirmative act than a regulation promulgated by the Bureau of Indian Affairs, which purports simply to set up the machinery, or it's referred to in other aspects of case law, as the channeling function of that original jurisdiction. I do think it's important for the court to consider how the CFR court of appeals interprets their own lower trial courts. And as it's cited both in the district court's decision below and both briefs of the appellant and the appellee, the CFR courts routinely find that the basis for the ability to prosecute is that inherent sovereignty in the jurisdiction in which the court sits. And when you're looking at the interpretation of, when something is making an interpretation of its own existence, I don't think that it's unreasonable for this court to consider that as strong persuasive authority, as essentially a comedy to the tribal courts. It also cuts against both the precedence of this court as well as a number of other jurisdictions which have agreed with this rule that these are forums for the exercise of jurisdiction, such as CTS Gaming, Cato Nation of Oklahoma. And it conflicts with the notion of how Congress interprets these courts in the Indian Civil Rights Act of 25 U.S.C. 1301 sub 2, where they refer to these courts as a mechanism through which tribes can exercise their power of self-governance. Counsel, this is Judge Billups, and I guess I'm wondering, what is the outer limit, which is to say how much federal involvement before the tribe loses its inherent sovereignty to prosecute Indians in Indian country? What would it take? Your Honor, it's an interesting hypothetical. I would suggest to the court that Congress would need to affirmatively act to exercise their established plenary authority to regulate the tribes to pass in the law something that affirmatively gave the federal government to expand its jurisdiction to misdemeanors in this circumstance. I disagree with the appellant counsel that a regulation that talks about machinery, this channeling function, would get us there. Appellant mentioned in response to one of Judge Seymour's questions, what's the difference between a tribal and CFR court? And I would submit to this court that in terms of the jurisdiction, there's no difference. Their jurisdiction matches the boundaries of tribal court jurisdiction exactly. And tribal courts are still very heavily regulated by the federal government, by the Bureau of Indian Affairs. They have to approve all sorts of aspects of tribal courts' existence, including the tribal codes, the setup, the various penalties that can be imposed. And as the appellant's argument gets closer to asserting that that level of federal oversight creates the courts as an entity of the federal government, that butts up against the argument that was rejected in the Wheeler case, where the Supreme Court said that although these courts are heavily regulated, although these tribal courts are present by virtue of Congress allowing them to exist as domestic-dependent nations, that they still have the ability to bring cases in the names of the tribe and they're not simply just creations of the federal government. Your Honors, I also would like to continue to emphasize some of the language from the Sanjay Val case beyond what's been mentioned so far. In that case, it discusses not the intermediate or immediate locus of power, but the ultimate source. And I think that this court should read that to mean that we're not talking about what happened yesterday or what happened last week. We're talking about the ultimate historically rooted inquiry of where these courts get their power to prosecute. Appellant's argument for a dual wellspring analysis, if you were to look at that through the lens of the Sanjay Val case, you could make an argument that Puerto Rico and the United States government would have a much better claim to such a dual wellspring approach than you do in this tribal setting, where you have a constitution that has been ratified by the Puerto Rican people. I would submit to the court that if such a dual wellspring was possible, you couldn't probably find a better example of where that would occur than Puerto Rico. And as we see in the Sanjay Val case, the Supreme Court says explicitly, we're looking at the ultimate source. Counsel, this is Judge Holmes. Could I switch to the other issue in this case for a moment, please, related to the admission of the witness statement? Yes, Your Honor. Okay. It was my understanding at least one of the arguments that you're making towards the appropriateness of the admission of the battering of the girlfriend testimony, that you know what testimony I'm talking about, right? Yes, Your Honor. Okay. As it relates to that testimony, was an argument for invited error. That gives me a little bit of concern. I want to tease that out with you a bit, because it seems to me that the two cases, I think you had an 11th Circuit case and two unpublished cases were cited in your brief. It seemed to me the nexus between the question asked by on cross-examination and the answer given that was later objected to was considerably closer than what we have here. I mean, what we have here is, did you know this person socially? And in response to that was some conversation with this reference to him having battered the girlfriend. It just seems to me that it is not your position, is it, that every time a defendant cross-examines a witness, they open the door to every statement that that witness might make as invited error? No, Your Honor. That's not our position. But I also think it's crucial to look at the full extent of the cross-examination that occurred in this case. The first, and this is at the record, Volume 5, at 95, the defense counsel begins by asking about all of the different times that VW had met Mr. Dineshji and then continues to push her on that point, specifically asking about when she saw him selling jewelry and on specific occasions that this occurred. The first answer that VW provides with respect to seeing him when he got out of jail, that was not anything that defense counsel objected to, didn't ask the courts to strike it from the record, but continued to press on knowing full well from the discovery made available that these were the other instances that VW knew Mr. Dineshji from. Well, yeah, but knowing him and talking about battering the girlfriend, it seems to me are two pretty distinct things. I mean, yes, did you know him socially? Yes, I knew him socially when he was smoking dope. Yes, I knew him socially when he was killing his wife. I mean, it seems to me that there's got to be some boundary here, and again, if you can tell me something in these cases you cited that suggests that the nexus here is the same, I'd appreciate knowing it because I don't see those cases as being analogous to what we've got going on here. Your Honor, let me turn on the interpretation of the word socially. The social contact that VW knew with respect to Mr. Dineshji was Mr. Dineshji's girlfriend. That's the social connection that brought her within the penumbra of Mr. Dineshji. This is Judge Phillips, and you're running out of time. Let me ask you why you think it's harmless because obviously the climate issue here had beaten up a woman, and here she is saying that he did the same thing to someone else. Why is that harmless, just because of the overwhelming evidence? I think for a couple of reasons, Your Honor. First of all, the overwhelming evidence, the fact that... And Your Honor, I see my time has expired. May I answer the question? As far as I'm concerned, yes. There's, I think, a couple of different things that make it harmless. First of all, it was never referenced by counsel, either by the government or defense counsel, for the rest of the trial. Secondly, VW made a variety of materially consistent statements that are consistent with the physical and forensic evidence that were found in the case. And third, and most importantly, Mr. Dineshji provided six or seven completely inconsistent recitations of what occurred, including one that was done under oath before the jury, which contradicted his prior statements. So for those reasons, we would ask the courts to affirm Mr. Dineshji's conviction. Thank you, counsel. Thank you. Ms. Duncan, I think you have some time remaining, is that right? Yes, Your Honor. Okay. Thank you. I'd like to start where counsel for the government left off on this question about the witness DY's responses to defense counsel's question. And I think that the court is exactly right that the invited error doctrine cannot be read to say that if defense counsel asks a question, that the answer given, no matter how far afield it is from the question, cannot be reviewed by an appellate court. And in this case, the DY's answers were clearly beyond the scope of the questions asked by defense counsel. And when you read the transcript, it's apparent that she was trying to interject prejudicial information into the trial. So she was asked, you know, first, did you have visits and social conversation at City Market? And the answer is no. You know, the only time I've seen him was when I used to sell my jewelry, or I would see him when he got out of jail. I don't know he got out of prison. Well, let me stop you with that one, because there was no objection made to them getting out of jail. And you have not argued for plain error on appeal. And so why isn't that effectively waived? I saw your footnotes suggesting that these were part and parcel because they were around the same time. But why does that even work? I think that they need to be read in context with the follow-up question about punishment. I mean, when he asks about knowing about Mr. Danez P. socially, because they follow each other. And I recognize that counsel didn't object, but I think you can only read them fairly together. And counsel did object and ask for them to be struck. And they were highly prejudicial in the context of the case because credibility was key. Okay, counsel, you're out of time, so just wrap up this statement and then we'll conclude. Thank you, Your Honor. I would just say that because credibility was key and that evidence that Mr. Danez P. had been in jail and prison and was an abuser of his prior girlfriend when unanswered, it was not harmless in the context of the entire case. And I'd ask the court to reverse this case on the double jeopardy grounds and dismiss with prejudice or an alternative to order a new trial. Thank you. Thank you, counsel, both, for your fine arguments. Case is submitted. Thank you. Thank you.